FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

03 MAY -7  PM 6:3 I

U.S. DISTRICT COUR
N.D. OF ALABAMA

SECURITIES AND EXCHANGE
COMMISSION,

      PLAINTIFF,

v.                              CASE NO. CV-03-J-615-S

HEALTHSOUTH CORPORATION
and RICHARD SCRUSHY,

**ENTERED**

      DEFENDANTS.

MAY  7 2003

## MEMORANDUM OPINION

This cause came on to be heard on the plaintiff's petition for emergency relief

freezing the assets of defendant Richard M. Scrushy (doc. 2). The plaintiff Securities

and Exchange Commission ("SEC") was present by and through its counsel of record,

defendant Scrushy was present in person and through his counsel of record, and

defendant HealthSouth Corporation ("HealthSouth") was present through its counsel

of record.[1] The hearing commenced on April 9, 2003 and continued for 11 days,

during which the court heard testimony and received evidence. At the close of the

---

[1] HealthSouth and the SEC agreed to a Consent Order which was entered by this court on March 20, 2003 (doc. 5). Therefore, the assets of HealthSouth are not affected by the outcome of the hearing on the emergency asset freeze, nor are they the subject of this Memorandum Opinion and Order. However, HealthSouth was present through counsel for the duration of the hearing.

124

plaintiff's evidence, defendant Scrushy, in open court and on the record, moved to dismiss the claims against him.[2] The court took said motion under advisement and the defendant thereafter presented evidence and witnesses in opposition to the plaintiff's motion. Based on the testimony heard, the evidence received and the arguments of the parties, the court makes the following findings of fact and conclusions of law:

## PROCEDURAL BACKGROUND

The original complaint was filed in this case on March 19, 2003 (doc. 1) along with a petition for emergency relief freezing the assets of defendant Richard M. Scrushy and requiring HealthSouth Corporation to escrow extraordinary payments (doc. 3). The court granted said petition and set the matter for hearing on March 25, 2003 (doc. 5). On March 25, 2003, the court entered an Interim Order agreed to by the parties, and reset the petition for hearing on April 9, 2003 (docs. 10 and 12). On April 4, 2003, the plaintiff filed an amended complaint (doc. 21) which makes the following allegations against the defendants:

Count I: That the defendants, from at least 1999 through the second quarter of 2002, in connection with the offer and/or sale of securities, by use of interstate commerce or the mail, obtained money, either directly or indirectly by misstatements

---

[2]The court also had pending before it a motion by defendant Scrushy for partial lifting of the asset freeze order (doc. 49), filed the day before this hearing began. Said motion sought to limit the hearing to whether the asset freeze should remain in effect as the defendant needed further time to obtain discovery. The SEC objected to this motion in open court. Hearing record ("H.R.") at 9. The court finds said motion to be moot and shall issue said finding by separate order.

of material facts or through the omission of material facts and that such transactions, practices and course of business operated as a fraud upon purchasers of the securities. Further, that the defendants knowingly, intentionally and/or recklessly engaged in this conduct and that they did so with the intent to deceive, manipulate or defraud, and that such conduct violates 15 U.S.C. § 77q(a).

Count II:  That the defendants, from at least 1999 through the second quarter of 2002, in connection with the purchase or sale of securities, by use of interstate commerce or the mail, employed schemes to defraud, made untrue statements of material fact and omitted material facts in order to make such statements, and engaged in practices which operated as a fraud and deceit upon the purchasers of the securities. Such conduct was undertaken knowingly, intentionally and/or recklessly and with the intent to deceive, and that such conduct violates 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).

Count III: Defendant HealthSouth violated 15 U.S.C. § 78m(a) and Rules 12b-20, 13a-1 and 13a-13 thereunder (17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13) by filing annual and periodic reports with the SEC from at least 1999 through the second quarter of 2002 that materially misstated revenues, expenses, assets and liabilities.

Count IV: Defendant Scrushy violated 15 U.S.C. § 78m(a) and Rules 12b-20, 13a-1 and 13a-13 thereunder (17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13) by aiding and abetting HealthSouth's filing annual and periodic reports with the SEC from at least 1999 through the second quarter of 2002 that materially misstated revenues, expenses, assets and liabilities.  Such actions by Scrushy were knowing or reckless.

Count V: Defendant HealthSouth violated 15 U.S.C. § 78m(b)(2)(A) by failing to make and keep books, records and accounts which accurately and fairly reflected transactions and dispositions of assets from at least 1999 through the second quarter of 2002.  Defendant HealthSouth further violated 15 U.S.C. § 78m(b)(2)(B) for the time period of at least 1999 through the second quarter of 2002 by failing to devise and maintain a system of internal accounting controls sufficient to assure that transactions were executed in accordance with management's authorization; by failing to ensure that transactions were recorded as necessary (i) to permit preparation of financial statements in accordance with generally accepted accounting principles and (ii) to maintain accountability of assets; by failing to ensure access to assets was permitted only in accordance with management's authorization; and by failing to ensure that the recorded accountability for assets was compared with existing assets

4

at reasonable intervals and appropriate action was taken with regard to any differences.

Count VI: Defendant Scrushy violated 15 U.S.C. § 78m(b)(2)(A) and § 78m(b)(2)(B) by aiding and abetting HealthSouth's conduct alleged in Count V and that such conduct by defendant Scrushy was done knowingly or recklessly.

Count VII: Defendant Scrushy violated 15 U.S.C. § 78m(b)(5) and Rule 13b2-1 (17 C.F.R. § 240.13b2-1) thereunder by knowingly circumventing, knowingly failing to implement a system of internal accounting controls, or knowingly falsifying any book, record or account required by 15 U.S.C. § 78m(b)(2)(A), as prohibited by 17 C.F.R. § 240.13b2-1.

Based on these allegations, the plaintiff requests this court to enjoin the defendants from engaging in the above-described activities and further to disgorge any ill-gotten gains and losses avoided as a result of the conduct alleged.  Amended complaint at 16-18.  The court notes that defendant Scrushy's assets are currently frozen pursuant to a Temporary Restraining Order issued by this court on March 19, 2003 and continued in effect since that time.  *See* doc. 75 at 4.

## PARALLEL CIVIL AND CRIMINAL PROCEEDINGS

*Discovery Considerations*

The SEC admitted in its closing argument that it patterned the complaint in this case after the guilty plea agreement entered by Weston Smith. This was revealed after defendant Scrushy's counsel pointed out that the complaint in this case contains the same typographical errors as those in Smith's guilty plea agreement. H.R. 1962. However, by drafting its complaint from a criminal guilty plea agreement, the SEC omitted to include any reference to any rule of civil procedure or statute which gives this court the authority to maintain the asset freeze initially entered pursuant to a temporary restraining order.[3] The SEC has asked this court to maintain the freeze until the conclusion of "the litigation."[4] The SEC failed to specify to which litigation

---

[3]In other words, in its haste to file this litigation, the SEC failed to convert the guilty plea agreement language into anything appropriate for a civil action. Although the SEC has bantered around language concerning defendant Scrushy's "guilt," this court has before it no more than whether defendant Scrushy's assets should remain frozen for the time being, a wholly civil matter.

[4]SEC counsel, in closing argument, stated that "[a]ll we are talking about here is not taking his assets away, just saying hold on to them for the next six, nine months, whatever it takes. It's not that onerous. That's why the standard is lower than for a preliminary injunction. He's claiming he won't dissipate them anyway, and that's all we want. We don't want them dissipated." H.R. 1966-1967. In contrast, defense counsel stated to the court that "When I called Mr. Hicks before this hearing and said to him is this going to be an asset freeze leading to a preliminary injunction in accordance with the typical process or are we doing something else? His statement to me was we are going to ask that the Court impose an asset freeze pending resolution of all the proceedings. I said, Bill, that could take four or five years. Are you asking for an asset freeze in perpetuity? He said, well, I really wouldn't put it that way, but we're going to ask for an asset freeze until the criminal proceedings are over with." H.R. 1892-1893.

Lending credence to the defendant's argument that plaintiff is trying to get an asset freeze for the indefinite future is the fact that, since this court heard closing arguments, the SEC has submitted to the court's chambers, by fax, a document entitled "Plaintiff's Motion for, in the Event of an Adverse Ruling on the Merits, an Injunction Continuing the Asset Freeze Pending Appeal." The court notes such a ruling will accomplish the same thing as if this court granted an indefinite freeze.

it was referring: this matter, a criminal indictment everyone assumes to be in the near future, or the numerous other civil cases filed by stockholders and employees against defendants HealthSouth and Scrushy.[5]  The court thus finds the time for which the SEC seeks to have the freeze remain in effect to be speculative, at best.

In attempting to state a legal basis for the relief sought in this action, the plaintiff has alternatively advanced theories under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934, and the Securities Act of 1933.[6]  Counsel for the SEC stated:

> What this case is about isn't seizing Mr. Scrushy's assets, but preserving the status quo so that the money will be available to pay a final judgment so that thousands of little people who lost their life savings have a chance to get something back.

---

[5]The following cases, in addition to this one, are currently pending against defendants HealthSouth and Scrushy: CV 98-BE-2695-S, *Twin Plus, et al. v. HealthSouth Corp., et al.* (class action); CV 98-BE-2777-S, *Rigas v. HealthSouth Corp., et al.* (class action); CV 98-BE- 2831-S, *McCormick v. HealthSouth Corp., et al.* (class action); CV 02-BE-2165-S, *In re: HealthSouth Corp.* (consolidated class action); CV 02-C-2565-S, *Vredenurg v. Scrushy, et al.* (shareholder derivative action); CV 03-B-213-S, *Gross v. Scrushy, et al.* (shareholder derivative action); CV 03-BE-645-S, *Lucas v. HealthSouth Corp., et al.* (class action);  CV 03-BE-696-S, *Mirken v. HealthSouth Corp., et al.* (class action); CV 03-BE-713-S, *Li v. HealthSouth Corp., et al.* (class action); CV 03-BE-743-S, *Schwarz v. HealthSouth Corp., et al.* (class action); CV 03-BE-783-W, *Bross v. HealthSouth Corp., et al.* (ERISA class action); CV 03-BE-784-S, *Lancaster v. Healthsouth Corp., et al.* (ERISA class action); CV 03-J-814-S, *French v. HealthSouth Corp., et al.* (ERISA class action); CV 03-BE-848-S; *Perry v. HealthSouth Corp.* (class action); CV 03-BE-903-S, *The Ezra Charitable Trust v. HealthSouth* (class actions); CV 03-J-913-S, *Campbell v. HealthSouth Corp.,* (shareholder derivative action); CV 03-JEO-926-S, *Priest v. HealthSouth Corp.* (ERISA); and CV 03-BE-969-S, *Dubrow v. HealthSouth Corp. et al.* (class action).

[6]The SEC relies on Section 21C(c)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-3, for authority to require defendant HealthSouth to escrow extraordinary payments.  The court cannot discern from the SEC's pleadings whether it is also asking that defendant Scrushy's assets be frozen under this section.  In the event the SEC is so suggesting, the court notes Section 21C(c)(3) concerns only the "issuer" of securities and does not apply to an individual such as defendant Scrushy.

Our claim at this point is approximately seven hundred and eighty-six million plus some interest.  That includes full disgorgement, a one-time penalty on all gains, and an additional two time penalty on the insider trading gains or losses avoided.

I just want to note to the Court that under the Sarbanes Act the penalties can also go to the investors.  What we're trying to do is preserve Scrushy's assets until trial so that money is available.[7]

Hearing Record at 1859-1860.

Let me talk about dissipation very briefly.  We don't have to go very far to show a risk of dissipation of assets.  All we have to look at is their own motion to modify the asset freeze where they ask for fifty-seven million dollars and six hundred thousand a month....

I said at the outset that the investors have suffered enormous losses, ordinary people, as a result of the conduct that Mr. Scrushy and his henchmen, and I guess what I have to call hench women (sic).

It would not be just to let Mr. Scrushy continue living the lifestyle of the rich and famous when every dollar he spends is one less dollar that will be around to compensate the victims at the end.  Every dollar....

And what we are trying to do here is only preserve the status quo until trial so that money, if and when we win, and by the time it comes to trial, we'll have a football stadium of witnesses, but if and when we win, that there's something left for these people.  And we ask you to maintain the freeze.

Hearing Record at 1879-1882.

The SEC argued in its Petition for Emergency Relief (doc. 2) that:

[A]n asset freeze is appropriate to prevent Scrushy from dissipating and concealing assets that would otherwise be available to pay disgorgement and civil penalties in this case. Moreover, as shown by the declaration

---

[7]Of course, for an additional two time penalty on insider trading gains or losses, the SEC must establish proof of insider trading as well as some amount which was gained by such trading. The court also notes that the asset freeze against defendant Scrushy was not brought under the Sarbanes-Oxley Act.

> attached to the memorandum in support of this petition and by HRC's
> public filings, HRC had made large extraordinary payments to its senior
> officers in each past years (sic).  No payments for HRC's most recent
> fiscal year have yet been made.  Scrushy remains in place as HRC's
> Chairman of the Board and CEO and could extraordinary payments (sic).
> Thus, it is likely that HRC may soon make those payments for the most
> recent fiscal year.

Petition at 3.  Assuming the court could intuit from "Scrushy remains in place as

HRC's Chairman of the Board and CEO and could extraordinary payments (sic)" what

it is the SEC alleges defendant Scrushy might do as Chairman and CEO, the fact of

the matter remains that defendant Scrushy no longer holds these positions. H.R. 1713,

1717-1718.

Defendant Scrushy asserted his Fifth Amendment right upon being called to the

witness stand by the SEC. H.R. 11.  He did so on the advice of his counsel because

of the pending criminal investigation against him. *See e.g.*, H.R. 28.  The court notes

that the majority of the evidence presented by the SEC, for the purpose of this court

maintaining the asset freeze, results from criminal investigations.[8]  Further, it is

obvious from the SEC's closing argument that it relied on this evidence.  Counsel for

the SEC stated:

---

[8]In addition, the court noted that every witness, other than the FBI agents and FBI technicians, called by the SEC during its case in chief had counsel present to advise him or her with respect to invoking their privilege against self-incrimination pursuant to the Fifth Amendment of the United States Constitution.

> What is the evidence of fraud and [Scrushy's] role?  There are numerous plea colloquies now admitted into evidence.  Of those, four – the colloquy of Mr. Owens, Mr. Livesay, Mr. Harris, and Mr. Smith – implicate Mr. Scrushy in the fraud.  Mr. Owens and Mr. Smith held various positions at various times, including CFO, during their course of employment.
>
> They both affirmed, as do others in various parts, that beginning in 1996 or sometime prior to 1997, they and Mr. Scrushy recognized that the company's real earnings would not meet Wall Street expectations.  They determined numbers which were the desired earning numbers and instructed other employees to find ways to artificially inflate earnings.

H.R. 1861-1862.

The court questions the SEC, a civil investigatory body, for its use of the FBI to undertake discovery for this civil action, when the consequence of such methods is that the product of the FBI's labor is non-discoverable to the defendant in this civil proceeding.  *See infra* at note 11.  It is obvious from the questions counsel for the SEC asked on direct examination of defendant Scrushy that the SEC had access to and analyzed the content of the CD admitted into evidence during this proceeding.[9]  However, said counsel also represented to this court that he had not furnished the defendant a copy of the CD because "it wasn't his to give" and that he had not heard the conversation in question prior to it being played in open court.

_____

[9]Although both parties to this litigation made references to a "tape" and a "tape recording" during the hearing, all such references are to the sole CD in question.  No recording other than the CD has been placed into evidence by either party.

10

One witness called by the SEC was Greg Gauger, an FBI agent. H.R. 238. He testified that he personally participated in obtaining the recording in question by placing a recording device on William Owens.[10]   H.R. 241-243.   The FBI then instructed Owens to return to work and talk to Scrushy to record a conversation with Scrushy. H.R. 243. Owens testified he wore a wire at the request of the FBI and U.S. Attorney's office, not the SEC. H.R. 476. He also testified that the FBI directed him with respect to the tenor of questions he was to ask Scrushy. H.R. 479.

Owens stated he met with FBI Agents Gauger and Kelly, and George Martin from the U. S. Attorney's office. H.R. 477. Owens wore the wire knowing that FBI agents were monitoring the conversation. H.R. 481-482.

The court asked counsel for the SEC to provide a copy of the CD to defendant Scrushy, to which counsel responded he would have to ask the FBI if he could have one.[11]  H.R. 251.  Upon the court suggesting that the SEC provide the copy already in

---

[10]William T. Owens was Controller of HealthSouth from March, 1986 until February, 2000. He then became CFO and held that position until August, 2001. In August, 2001 he became President and COO and in August, 2002 he became CEO. He was demoted from CEO to CFO in January, 2003. As to the reason for the demotion, Owens invoked his Fifth Amendment right not to answer. H.R. 507-508. *See also* 10-K for year end December 31, 2001 at 89, submitted as plaintiff exhibit 10. As CEO and CFO of HealthSouth, Owens signed the 10-Q for the quarter ending September 30, 2002. Plaintiff Exhibit 6. Plaintiff Exhibit 6, 8, 9, 10 and 11 are the only 10-Q's and 10-K's which were submitted to the court.

[11]The court questions the practice of introducing evidence which is not available, and cannot readily be made available, to opposing counsel. Under the Federal Rules of Civil Procedure, such conduct is prohibited. *See e.g.*, Rule 26(a), Fed.R.Civ.Pro. Under that Rule, production of the names of all individuals with discoverable information a party may use to support its claims, and a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody or control of the party and that the disclosing party may use to support its claims is required without a discovery request.

11

the courtroom to defendant Scrushy, counsel for the SEC stated, "It's not mine to give, is the bottom line ..." H.R. 252. Rather, the CD was at all times in the custody of the FBI. H.R. 290. In fact, Owens' testimony established that the CD is the result of the second attempt by the FBI to get statements by defendant Scrushy recorded. H.R. 301.

SEC counsel Hicks also told the court, "I have never had possession of any transcripts or anything like that. I asked them to produce this tape this morning. They did. They told me some things that were on it. I have never listened to it. I listened to parts of it last night, but not all." H.R. 348. The court inquired, "You mean to tell me you were going to offer a copy of the CD yesterday without ever having heard it?" Hicks replied, "At that point, yes, I knew what was on certain parts, but that's all." *Id.*

The court further ordered the SEC to produce to the defendant the CD of the recording made the morning of March 18, to which SEC counsel Hicks responded "I don't have any other tape. I don't have this tape, frankly, but I don't have any other tape...." H.R. 353.

The court was inundated with similar incidents wherein the fact of an ongoing criminal investigation was raised to stymie defendant Scrushy's efforts at discovery. Additionally, the testimony the court did hear raised serious questions of the witnesses' motivation for his or her testimony. For example, Michael Vines testified

he was told if he testified no charges would be brought against him.[12]  H.R. 81.  He

expounded that his deal with government was that if he testified against Scrushy, he

would not be criminally charged.  H.R. 82.  *See also* H.R. 98.

The plaintiff offered into evidence Plaintiff Exhibits 12, 13, 14, 15 and 16,

which consisted of the guilty plea agreements and Rule 11(f) statements of Weston

Smith, William Owens, Emery Harris, Angela Ayers, and Ken Livesay.[13]  H.R. 230-

234. However, the SEC stated the documents were not offered to prove its case, but

rather to show a likelihood of prevailing later.  Counsel for the SEC stated that the

"fact that these people made statements at all is relevant on that point." H.R. 235-236.

He further represented to the court that Harris' plea was offered into evidence because

it tended "to show the underlying scheme." H.R. 236.  Upon objections, the SEC then

asked the court to take judicial notice of just two plea colloquies instead of eight,

those two being Owens' and Smith's.  H.R.  356.  SEC counsel Loomis stated "I'm

---

[12]Michael Vines was employed by HealthSouth prior to May of 2002 as Asset Management
Supervisor for the Midwest region and all inpatient hospitals.  He reported to Cathy Edwards, an
assistant vice-president of finance/asset management.  H.R. 40-41, 49-50, 79.  Interestingly, Vines
testified that he has never, in his life, had a conversation with Scrushy.  H.R. 78.

[13]The court notes the Rule 11(f) statements and plea colloquies are riddled with errors.  For
example, in Weston Smith's plea colloquy, the prosecutor asserted that HealthSouth was formed
around 1934.  Smith plea colloquy at 63, CR 03-PT-126-S, submitted as Plaintiff Exhibit 23.
Although Smith testified he agreed to the statement, he also testified this was incorrect.  H.R.
1104-1105.  Similarly, Livesay's Rule 11(f) statement says on Page 1 that HealthSouth's
common stock was listed on the New York Stock Exchange since on or about 1998.  *See* CR 03-
C-182-S, doc. 3.  In Virginia Valentine's Rule 11(f) statement, the government asserts that the
conspiracy began before 1994 although this defendant did not begin employment until 1995.  CR
03-J-183-S, doc. 9.  Interestingly, Kay Morgan's Rule 11(f) statement, filed in the same case,
alleges the conspiracy began in 1997.  *See* CR 03-J-183-S, doc. 6.

asking the court to take judicial notice of the fact that there was a plea and the fact that they were found guilty by the courts of violations of the securities laws, statutes, anti-fraud provisions .... We are not asserting it for the truth of the matter." H.R. 357. He continued, "Not the Rule 11 statements, but only the colloquies. For the purpose of the court taking judicial notice that the president and the COO and former CFO have pled guilty to securities fraud." H.R. 357.

Several days later, the SEC asked that the colloquies of Livesay, Harris, Ayers, Valentine, Morgan and Edwards, marked as Plaintiff Exhibits 25-27, be admitted "just for notice purposes, and also with respect to Ken Livesay and Mr. Harris because they've invoked their Fifth, they are unavailable and therefore statements against penal interest (sic)." H.R. 1822-1823. He also stated "we're trying to show that these people have pled guilty and have directly implicated Mr. Scrushy." H.R. 1823.

At one point, during a conference held outside the presence of the general public, the court had to ask the U.S. Attorney, Alice Martin, who was not requested to attend the side bar, to leave. H.R. 282. Shortly thereafter, the U.S. Attorney's Office and Department of Justice filed their first motion to intervene in the proceedings[14] (doc. 60). H.R. 348. After court adjourned for the day, Richard Smith,

---

[14]The U.S. Attorney's Office and the Department of Justice filed five separate motions to intervene during the course of the hearing (docs. 60, 62, 65, 81, 94). These motions listed Alice Martin, on behalf of the U.S. Attorney's Office, and Richard Smith, on behalf of the Department of Justice, Criminal Division, as counsel. Each of these motions requested a 60 day stay of discovery as alternative relief for the purpose of "permitting the grand jury to complete its investigation and

Deputy Chief Counsel for Department of Justice, Fraud Section, Criminal Division,

stated on the record, "I filed a motion to intervene in these proceedings regarding the

Court's ruling you made during Mr. Gauger's testimony. You ordered Mr. Gauger to

produce audiotapes of conversations that took place on March 18, 2003." H.R. 449.

The court responded, to which Richard Smith stated:

> That is what the Department of Justice is objecting to ... because that
> would provide discovery that's not available under the Rules of Criminal
> Procedure to the defense.
> The tape, what we've turned over to the SEC was a four-hour tape
> that took place of conversations in the afternoon, from about 3:00 to 5:30
> p.m. The tape that's referred to at the beginning of that ... is about a
> taped conversation that took place from 8:00 to 12:00 ...
> The Department is objecting to turning over that evidence because
> they are using this civil proceeding to obtain evidence that they would
> not be entitled to at this stage of the criminal investigation in an effort to
> disclose any conversations of other witnesses or people that are on those
> tapes that either would be targets, subjects of the investigation. We don't
> want to identify for the public or for the defense other people who may
> be witnesses or targets.

H.R. 450. Mr. Smith then continued by stating, "There are a number of conversations

that the defense would not be entitled to under the Rules of Criminal Procedure." The

court reminded Mr. Smith that this is a civil case, to which Mr. Smith replied, "Right.

In *United States v. Campbell*, a Fifth Circuit case, that makes it clear that in a civil

proceeding the defendant should not be allowed to get discovery they would not

---

the Government to properly pursue its criminal prosecution." Additionally, AUSA J. Patton
Meadows filed a Notice of Appearance (doc. 78) for "the purpose of representing the interests of the
United States regarding its previously filed motions to intervene."

otherwise be entitled to in a criminal proceeding." H.R. 453. He continued, "And therefore the government is objecting to the Court, with all due respect, ordering the FBI to turn over a tape that, according to *Campbell,* would not be discoverable in a criminal case to the defense in a civil proceeding." H.R. 453.

The court noted that the Department of Justice asked for a continuance of 60 days in its motion and that the court would have to weigh the harm to the defendant of a continuance of the freeze order of 60 days "in order for you to do whatever discovery needed to be done in the criminal case." H.R. 453. Mr. Smith responded that the government only needed the stay for 60 days if the Court required the government to turn over the tape. He further stated that he was requesting that the court reconsider its order. He stated, "Do not disclose to the defense evidence from a criminal case what they would not be entitled to under the Rules of Criminal Procedure, and that's why we filed a motion to intervene." H.R. 453. *See also* Motions to Intervene (docs. 60, 62, 81, 85 and 94), at 2.

The government having repeatedly asked the court to stay this matter raised the very question with which this court is now confronted, that being defendant Scrushy's inherent inability to present evidence in his defense due to the ongoing criminal investigation. Although the SEC repeatedly represented that it was not offering the plea colloquies for the truth of the matters asserted therein, counsel's statements in

16

closing argument contradict that representation. Because the individual witnesses who had already entered pleas, or already arranged to enter pleas, when called by defendant Scrushy to testify, stated only that they invoked their Fifth Amendment privilege against self-incrimination, defendant Scrushy was effectively denied his right to cross examine these witnesses. Additionally, defendant Scrushy was denied the right to explore these witnesses' motives or reasons for entering guilty plea agreements.[15] Because the SEC then represented to the court in its closing argument that these plea colloquies implicate the defendant, cross examination was critical to the defendant's right to a fair hearing. Further adding to this inability to engage in cross examination was Mr. Richard Smith's representation to the court that should Bill Owens be called to the stand, he would be forced to file another motion to intervene to object to the defendant "attempting to put on a witness in a criminal case in a civil proceeding." H.R. 460. He made similar motions with regard to every individual who was called to testify by defendant Scrushy who had already entered into a plea bargain arrangement with the U.S. Attorney's Office.[16] *See* H.R. 474 (Richard Smith further

---

[15]Each of these witnesses entered a plea as part of a plea bargain by which he or she agreed to provide the government with "substantial assistance in the investigation or prosecution of another person who has committed an offense" in exchange for a motion pursuant to United States Sentencing Guidelines § 5K1.1 and 18 U.S.C. § 3553(e) which would permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range and also below any applicable mandatory minimum sentence. *See e.g.*, Plea Agreement and Conditions in CR-03-J-183-S (U.S. v. Ayers, et al.) and CR 03-B-131-S (U.S. v. Owens).

[16]The court noted on the record that Mr. Hood and Ms. Simmons from the U.S. Attorney's office had been present for the entire proceeding. H.R. 461.

filed a Motion to Quash subpoenas, and to Prohibit Compelled Testimony, and for Stay of Discovery).

Upon Owens' invocation of his Fifth Amendment right, Mr. Smith, from the Department of Justice, argued to the court that Owens was within his rights to take the Fifth. H.R. 483. Owens' own attorney (Helmsing) was present in the courtroom at the time. Richard Smith further stated that the plea agreement entered by Owens did not "shield him from liability from the state or any other regulatory agency that would have jurisdiction over the crimes he committed. We do not bind the United States Attorney's office or any other law enforcement agency of taking actions on the conduct he's pled to ... we did not provide him any shield from liability from other agencies." H.R. 485. The court notes that, in spite of Richard Smith's representation, the plea agreements were in fact signed not only by the U.S. Attorney's Office, but also the Department of Justice, Fraud Section, Criminal Division.

During Owens' testimony, Richard Smith repeatedly objected. He stated that some of defense counsel's questions and answers thereto would "disclose some evidence of a potential witness or other members, people that could testify before the grand jury or other potential targets of this investigation. And we do not want to go into that area." H.R. 493. He then objected, "[t]his is the impetus of the discovery the government has been objecting about because we're going to start disclosing people

18

who are either subjects or targets of a grand jury investigation or potential witnesses who could potentially be intimidated or harassed by this." H.R. 495. Smith objected to most questions to Owens by defense counsel not directly related to the contents of the wire. *See e.g.* H.R. 506 (by Richard Smith: "I'm going to object to this line of questioning. It is clearly out of the scope of what's on the tape, Your Honor, at this point in time"). *See also* H.R. 510, 513 (by Richard Smith: "I'm going to object at this time. Ultimately, it's going to be fundamental in the criminal case, Your Honor"); H.R. 515 ("I'm going to object to this because it's eliciting evidence that's going to be relevant to the criminal case, and ask the Court to not require the witness to answer that question").

In conference, Richard Smith informed the court that the questions defense counsel Sjoblom was asking Owens are part of another recorded conversation contained on the same CD that was not played in court. H.R. 501-502. He stated that other people which are going to become targets, or subjects of the ongoing investigation, would be disclosed. H.R. 502.

Although much of the SEC's case is based on the allegation of a group of HealthSouth employees who referred to themselves as "the family," when defense counsel questioned Owens about it, Richard Smith objected, stating that Owens would "disclose the targets, the subjects of an ongoing investigation who may not know that

19

they are targets." H.R. 533. Even though most of the Department of Justice's objections were overruled, because of the criminal investigation, Owens invoked his Fifth Amendment rights in response to this question. However, responses to questions such as the ones about "the family" were crucial to the defense. *See* Amended Complaint, ¶ 19. Defendant Scrushy's inability to examine these witnesses effectively denied him his right to confront his accusers, while at the same time the SEC was relying on the colloquies of said accusers to attempt to freeze defendant Scrushy's assets. The SEC alleged in its amended complaint that "[HealthSouth's] senior accounting personnel then convened a meeting to 'fix' the earnings shortfall. By 1997, the attendees referred to these meetings as 'family meetings' and referred themselves (sic) as 'family members.'" Amended complaint ¶ 19. Of those witnesses who did not invoke the Fifth Amendment, each testified he or she had never heard of this term being used at HealthSouth. H.R. 18-19 (Goodreau); 151 (Henze); 731 (Tanner); 771-772 (Esclovan); 998 (Taylor); 1258 (Douglas); 1294 (Whitehurst); and 1418 (Fowler).

Defense counsel argued that:

It has also become abundantly clear that what is going on here is that the Department of Justice in the middle of a criminal proceeding is using the Securities and Exchange Commission, a civil body, to get this man cornered so he cannot defend himself, take away his property, deny him the right to confront his accusers, and put in one scrap of evidence out of context. I think that that is fraught with many constitutional problems.

20

> I think that this hearing, as we had suggested in our brief, is clearly the
> precursor for a setup to the criminal indictment.

H.R. 495.  He further stated "I think they have waived grand jury information by

bringing it into this courtroom and playing it in this court.  I think they have waived

any investigative privilege that they are talking about by bringing this evidence into

this courtroom, offering it up, talking about how they did this, the monitoring process,

laying the foundation."  H.R. 496.

For example, Anthony "Tony" Tanner was called by defendant Scrushy to

testify in his behalf.  Tanner did so, testifying about how HealthSouth was formed,

who its founders were and how they divided the founders' duties from HealthSouth's

inception until Tanner retired in 1999.[17]  The first question counsel for the SEC asked

Tanner on cross-examination was "Did Mr. Scrushy contact you over the past

---

[17]Tony Tanner was one of the five founders of HealthSouth Corporation.  He testified as follows: Healthsouth, then known as AmCare, was founded in 1984 by defendant Scrushy, Anthony Tanner, Aaron Beam, John Midkiff and Gene Smith.  H.R. 691-693, 699.  The five men had worked together at Life Mark Corporation in Houston, Texas, and with the exception of Midkiff, remained friends over the years.  H.R. 694, 711-712.  Due to a merger at Life Mark, they were going to be unemployed.  H.R. 697.  Defendant Scrushy was President, CEO, and Chairman, Tanner was Vice President of Clinical and professional Programs, Beam was Vice President of Finance, Gene Smith was Vice President of Operations and Midkiff was Vice President of Development.  H.R. 692.  Beam was in charge of the financial figures, Tanner handled "words" and defendant Scrushy was the "idea man."  H.R. 692.  Scrushy was motivational and the salesman for the company.  H.R. 712.  The concept for HealthSouth originated with Scrushy, as a "CORF," which was a comprehensive outpatient rehabilitation facility.  H.R. 693, 698.  Defendant Scrushy obtained investment funding, and upon their loss of employment at Life Mark, they began AmCare on January 23, 1984.  H.R. 699.  All five of the men put in their own money as well, four of them putting in $5,000.00 and defendant Scrushy contributing something more than that.  H.R. 705.

Over time, from one facility in Little Rock, Arkansas, the company grew until it encompassed the 1,800 facilities it owns today.  H.R. 703-704.  Ernst & Young (then Ernst & Whinney) were the company's outside auditors.  H.R. 707.  In September, 1986, the company had its initial public stock offering.  H.R. 705.  HealthSouth became a New York Stock Exchange company in September, 1989.  H.R. 1141.

weekend?" H.R. 733. This was followed by "Did he state in substance that he's always been there for you and now you have to be there for him?" H.R. 733. Thereafter, defense counsel asked Tanner if the SEC spoke to him about a conversation he had with defendant Scrushy. Upon answering "no," Tanner's attorney questioned whether Tanner's contacts with the government were relevant to the proceeding. The court noted that the government had intervened in the case. Defense counsel then questioned Tanner as to whether the FBI or the U.S. Attorney's Office had spoken to him before his testimony, to which Tanner replied "yes." H.R. 750-751. At that point, Pat Meadows, with the U.S. Attorney's Office, stated he objected to any testimony about any such conversation, and noted for the court that he had filed an appearance in this case. Upon pointing out that the government had not filed a motion to intervene on behalf of the government with respect to this witness, Mr. Meadows agreed, but stated that if he had spoken to the FBI, it could interfere with an ongoing criminal investigation. H.R. 751. Tanner then testified that the FBI, specifically Agent Kelly, asked him about a conversation Tanner had with Scrushy during the weekend recess of these proceedings. H.R. 752.

Upon questioning, Tanner testified that FBI Agent Kelly contacted Tanner's daughter at their home. H.R. 754-755. This contact was made following the first day

22

of these proceedings, after Diane Henze,[18] called as a witness by the SEC, testified

that her complaint to Corporate Compliance went to Tanner, and Teresa Sanders,[19]

also called as a witness by the SEC, testified that she went to Tanner after Mike

Martin[20] withdrew her access to field location information.[21] H.R. 159; 180.  It is

obvious from the timing of the FBI's contact with Tanner's daughter that the FBI was

using this civil proceeding to glean evidence it may use in its criminal investigation

of defendant Scrushy, as Tanner's testimony was that the FBI agent called his home

and spoke to his daughter the evening of Henze's testimony.  H.R. 755.

Having the FBI call his home was intimidating to him and his daughter.  H.R.

764.  Tanner stated he called Kelly back, and Kelly asked him about the statements

of witnesses who had already testified before this court.  H.R. 756.

In a conference outside the presence of the general public on this same topic,

SEC counsel Hicks states "I was told ... Mr. Tanner's lawyer contacted somebody, I

think on the DOJ side, and related the conversation and expressed concerns about

---

[18]Diane Henze was a Vice President of Finance from 1998 until 2000 when she became Vice President of Internet Operations.  H.R. 103-104.

[19]Teresa Sanders held various titles at HealthSouth from 1990 until 1999, all of which involved her job duties as internal auditor.  H.R. 163-164.

[20]Mike Martin became CFO in 1997.  H.R. 176.

[21]Tony Tanner was executive vice-president and the corporate compliance officer during Sanders employ.  H.R. 184-185.

obstruction of justice and things like that and I was advised of that. I don't remember

by who. It was probably someone on the other side. And you know, I mean, that to

me – I think I got some more details later from Mr. Kelly just about what was asked

or something like that." In Chambers Hearing Transcript at 9. The court inquired of

Mr. Hicks how often he met with Agent Kelly, to which Hicks replied, "I don't

generally meet with him, I run into him." *Id.* at 10. Hicks then represented to the

court that he did not remember whether the FBI or U.S. Attorney's Office provided

him with the CD of Owens' conversation, but that it was someone on the "criminal

side." *Id.* at 10-11. He then remembered that he received the information about

Tanner from Agent Kelly. *Id.* at 11, 12. The court at that point reminded the SEC that

witness tampering, by the SEC or the FBI, was illegal under 18 U.S.C. § 1512(b). *Id.*

at 13.

SEC counsel Loomis also reminded defense counsel during this conference that

the SEC never had possession of the CD. *Id.* at 15. SEC counsel Hicks then reiterated

that he never listened to the CD and never saw a transcript of it, but had been given

indications of what was in that conversation. Both Hicks and Loomis then again

stated they never had the CD. *Id.* at 15. The representations to Hicks and Loomis

about the contents of the CD were made by FBI Agent Gauger. *Id.* at 16-17. Hicks

then represented to the court that perhaps one of the Assistant U.S. Attorneys told him

what was on the CD.[22]  *Id.* at 17.  Hicks also represented that the U.S. Attorney's

Office believed the SEC to be causing problems and walled them off from "99% ...

of what they have." [23] *Id.* at 18.

Weston Smith, who had previously pled guilty, was called to testify.[24] Richard

Smith again stated, "The Government has filed a motion to intervene asking the Court

to preclude or prohibit any questions regarding a criminal investigation. Mr. Weston

Smith is one of the individuals who pled guilty as part of the ongoing investigation."

H.R. 1023.  Weston Smith testified that he had entered a guilty plea in a criminal

proceeding in this matter on March 19, 2003.  H.R. 1036.  Richard Smith objected to

many questions posed to this witness, although the witness pled the Fifth Amendment

to most of the questions.  In response to a question concerning whether there was a

scheme at HealthSouth in which he and his wife[25] came up with the number of 175

_____

[22]SEC's counsel's direct examination of defendant Scrushy unmistakably was based on the content of the CD.

[23]Cooperation between the SEC and the U.S. Attorney's Office is permitted.  *See* 15 U.S.C. § 78u(d)(1)(1981). However, this cooperation seems to be envisioned as the SEC providing the U.S. Attorney's Office with evidence garnered in its civil proceeding, not the U.S. Attorney's Office and the FBI providing the SEC with evidence gathered in pursuit of indictments.  *See e.g., SEC v. Dresser Indus., Inc.,* 628 F.2d 1368, 1385 (D.C.Cir.1980); *SEC v. First Jersey Securities, Inc.,* 1987 WL 8655 (S.D.N.Y.1987)

[24]Weston Smith was Controller of HealthSouth from March, 2000 to August, 2001, and CFO from August, 2001 until August, 2002. H.R. 1037-1038.  Because of a planned spin-off of the surgical centers, Weston Smith then, as an executive vice-president, reported to Larry Taylor, president of the surgical centers division, until approximately December, 2002. H.R. 1034-1035. After the spin-off did not occur, he was moved to Executive Vice-President Inpatient Operations under Pat Foster. H.R. 1035.

[25]Weston Smith is married to Susan Smith who became the Director of Reimbursement after Weston Smith was promoted from this position to Controller in March, 2000. H.R. 1036-1038.

million dollars as the effect of Transmittal 1753 so that he could reduce Wall Street earning expectations, Richard Smith again objected and asserted that the questioning would disclose information relevant to the criminal investigation of other witnesses.[26] H.R. 1046.  Upon being asked if the SEC alleged more than one type of fraud in which Weston Smith participated, Richard Smith again objected, claiming that "[i]f there is another fraud, we're going to object that it's getting into the criminal case once again.  And we would ask the Court to not require the witness to answer that question."  H.R. 1054-1055.  The SEC introduced Weston Smith's plea agreement, Rule 11(f) statement and Information to which he pled guilty as Plaintiff Exhibit 12. H.R. 1096-1097.  Smith's plea was also attached to the SEC's Rule 65(b) certification when the SEC sought the *ex parte* temporary freeze in this matter.[27]

A similar scenario occurred during the testimony of Rebecca Kay Morgan, who had her own counsel, with Richard Smith objecting to defense counsel's questions and

---

[26]*See* Amended Complaint, ¶¶ 36-37.

[27]The SEC's pleadings indicate that the SEC was conducting an entirely different investigation until Weston Smith pled guilty on March 19, 2003 in case number CR 03-PT-126-S. The complaint in this case was based entirely on Smith's plea. *See* SEC's opposition to defendant Scrushy's motion for a protective order (doc. 8) at 4-5 ("As Scrushy noted, the Commission's investigation initially focused on possible insider trading, Scrushy Motion at ¶ 4, and Scrushy's inviestigative (sic) testimony primarily explored this topic. Id. at ¶ 5. It was not until March 15, 2003, when the Commission participated in an interview with HRC's former Chief Financial Officer, Weston Smith, that the investigation turned to the accounting fraud alleged in the Commission's complaint .... Thus, Scrushy's investigative testimony does not relate to the issues currently before the Court").

the witness pleading the Fifth Amendment.[28]  H.R. 1107-1126.  The same occurred

during the testimony of Kenneth K. Livesay, who similarly had his own counsel.[29]

H.R. 1126-1137.   When Malcolm "Tad" McVay took the witness stand, also

represented by his own counsel, Richard Smith was again in court.[30]  H.R. 1568.

Richard Smith stated in open court that McVay had knowledge of ongoing criminal

investigations and was in discussions with the U.S. Attorney's Office, thus he

requested to be allowed to orally amend his motion to include McVay in his objection

that no witness be asked any questions regarding ongoing criminal investigation.  H.R.

1568.

McVay testified that he signed a plea bargain agreement on April 21, 2003,

**after** he was subpoenaed in this case.  H.R. 1582-1583, 1585.  McVay pled the Fifth

Amendment to almost all questions.  H.R. 1571-1590.  SEC counsel Hicks tendered

McVay's plea agreement, Rule 11(f) and information as Plaintiff Exhibits 51-53.

H.R. 1587.  McVay had entered a cooperation agreement with government and was

---

[28]Rebecca "Kay" Morgan invoked the Fifth Amendment as to any position she held while employed at HealthSouth. H.R. 1110.  However, other testimony shows she was the Group Vice-President for General Corporate Accounting and/or the Assistant Controller during the relevant time period. H.R. 116, 1241, 1274, 1341.

[29]Kenneth Livesay was Assistant Controller from 1989-1999, prior to becoming Chief Information Officer. H.R. 115, 150.  However, upon being asked about his positions with HealthSouth, Livesay pled the Fifth. H.R. 1127-1128.

[30]Malcolm McVay was asked if he was Director of Investor Relations from September, 1999 until February, 2000; Treasurer from February, 2000 until July, 2002, CFO from August, 2002 until January 6, 2003; and then demoted back to treasurer, and he invoked the Fifth Amendment in regard to each of these questions. H.R. 1572.

informed that a §5K1.1 motion for substantial assistance would be made on his behalf.[31]  H.R. 1588-1590.

Emery Harris' testimony was similar to the other witnesses who had entered plea arrangements with the U.S. Attorney's Office.[32]  Harris was present with his attorney. H.R. 1598. Richard Smith filed a motion to intervene. H.R. 1598. Harris then asserted his Fifth Amendment right to almost every question asked of him. H.R. 1599-1617. Interestingly, although the factual basis for the case before this court involves, in great part, false journal entries, Richard Smith objected to these questions, stating the questions were directed to matters that delve into the criminal investigation.[33]  H.R. 1608-09. When Harris was asked if he was a member of "the family," Richard Smith objected.[34]  H.R. 1611-1612. When Harris was asked if Kay Morgan falsified reconciliation statements to understate deposits at PNC Bank, Richard Smith objected. H.R. 1615.

---

[31]Although not all of the witnesses who had entered pleas testified about their cooperation agreements with the Department of Justice and the U.S. Attorney's Office as McVay did, the court does note that each of these witnesses had indeed entered a cooperation agreement with these governmental entities.

[32]Emery Harris was Group Vice President for General Accounting during some of this time. H.R. 116. He was Assistant Controller from either 1999 or 2000 until March, 2003. H.R. 579, 1601. Harris invoked the Fifth Amendment as to all questions concerning any position he ever held at HealthSouth. H.R. 1601-1602. In fact, Harris pled the Fifth as to all questions asked of him except for his name and whether he had ever met defense counsel before he testified. H.R. 1599-1617.

[33]*See* Amended Complaint, ¶¶ 20-27.

[34]*See* Amended Complaint, ¶ 19.

The FBI raided defendant Scrushy's office on March 18, 2003 at approximately 5:15 p.m. H.R. 784, 1209, 1411. Defendant Scrushy has had no access to his office since that date. H.R. 1211. His contract with HealthSouth was terminated the next day. H.R. 1211-1212, 1705-1706, 1713. Joel Gordon became interim chairman the day following FBI raid. H.R. 1705. Curt Miller, an accountant with Ernst &Young, HeathSouth's outside auditors, testified that Ernst & Young had been contacted by both the U.S. Attorney and the SEC and they were cooperating with them. H.R. 1489. Likewise, Kelly Coleman, a rebuttal witness for the SEC, testified that she had spoken with the U.S. Attorney's Office and Department of Justice about her testimony. H.R. 1814.

While the court understands that the FBI, the U.S. Attorney's Office and the Department of Justice sought to prevent the defendant from obtaining information he would not be entitled to in a criminal proceeding, this court does not have a criminal proceeding before it. While the governmental entities were within their rights to object to any such testimony, those very objections, and the ongoing criminal investigations, prevented this court from hearing substantial evidence to fairly render an opinion as to defendant Scrushy's involvement in the alleged scheme. Without such evidence, this court is being asked to rule on whether this individual should be deprived of every asset he has for the indefinite future.

The SEC admitted in its Rule 65(b) certification filed with the court that it was not able to ascertain which of defendant Scrushy's assets, if any, are attributable to the alleged ill-gotten gains and therefore **all** of his assets should be frozen. *See* Plaintiff's Certificate Pursuant to Rule 65(b) (doc. 3), ¶ 6. Although not required to do so, defendant Scrushy proved that at least 49 million dollars of his assets since 1993 are not derived from his HealthSouth income, bonus or sale of stock. H.R. 385-387 and Defendant Exhibits 22 and 23 (filed under seal).

Furthermore, although the SEC introduced and relied upon the plea colloquy of Kay Morgan, Angela Ayers, Virginia Valentine and Cathy Edwards, none of these employees in HealthSouth's accounting department actually implicated defendant Scrushy in their fraud. They all stated in the colloquies that they committed their fraud at the direction of Owens, Smith and Livesay, because they would get bonuses, keep their jobs and get stock options. Plea colloquy of Morgan, Ayers, Edwards and Valentine, CR 03-J-183-S at 18-22, submitted as Plaintiff Exhibit 25. Livesay stated in his colloquy that he got to keep his job, was paid a nice salary and got a bonus "most every year." Plea colloquy of Livesay, CR 03-C-182-S, at 12-13, submitted as Plaintiff Exhibit 26. Nowhere does Livesay state he took any action at the behest of defendant Scrushy.

Additionally, the court notes that Harris, during his colloquy, testified that he never saw a report signed by anyone and that he changed no records before 1999. Plea colloquy of Harris, CR 03-J-157-S, at 42-43, submitted as Plaintiff Exhibit 24.

Finally, despite the allegations of the SEC, it filed with the court and referred to in pleadings the SEC testimony of defendant Scrushy taken on March 14, 2003, before the SEC allegedly "became aware" of Weston Smith's intention to plead guilty. In said testimony, defendant Scrushy denied any wrongdoing. March 14, 2003 transcript (doc. 9) at 54. The testimony elicited at the March 14, 2003 deposition concerning the SEC's investigation into allegations of insider trading involving Transmittal 1753 is as likely, if not more likely, the topic of discussion between Owens and Scrushy on the CD on which the SEC relies so heavily as evidence of the scheme to inflate assets to meet Wall Street expectations. At the time of the deposition, five days before the complaint was filed in this case, the SEC allegedly knew nothing about any of the violations alleged here other than those related to Transmittal 1753.

As long as a criminal investigation is ongoing and the individuals who have pled guilty have not yet been sentenced, the key witnesses to defendant Scrushy's involvement or lack thereof will refuse to answer the very questions that would either support or rebut the SEC's allegations. Yet these are the same witnesses upon which

the SEC relies to keep the asset freeze in place. This court has no way to predict when the criminal case may be resolved so that this case may proceed without these crucial witnesses who are taking the Fifth Amendment.[35]

Because of the ongoing criminal investigation, defendant Scrushy has been placed in the precarious position of either waiving his Fifth Amendment rights and defending himself in the matter before this court, or asserting the privilege and probably losing this civil proceeding. While such a choice may not be unconstitutional, this court may still exercise its discretion to stay this case in the interest of justice.[36] *See Baxter v. Palmigiano*, 425 U.S. 308, 318-19, 96 S.Ct. 1551,

---

[35]The Supreme Court, in holding that a guilty plea does not waive the right to take the Fifth Amendment, has explained, "The concerns which justify the cross-examination when the defendant testifies are absent at a plea colloquy however. The purpose of a plea colloquy is to protect the defendant from an unintelligent or involuntary plea. The Government would turn this constitutional shield into a prosecutorial sword by having the defendant relinquish all rights against self incrimination upon entry of a guilty plea, including the right to remain silent at sentencing." *Mitchell v. U.S.* 526 U.S. 321, 322, 119 S.Ct. 1307, 1312 (1999). The Court continued by stating, "In this respect a guilty plea is more like an offer to stipulate than a decision to take the stand." *Id.* The Court went on to note that where the sentence has not yet been imposed, a defendant may have a legitimate fear of adverse consequences from further testimony." *Id.*, at 326, 119 S.Ct. at 1314.

In examining the issue, the Eleventh Circuit Court of Appeals stated, "We ... hold that a defendant retains the Fifth Amendment privilege despite having entered a guilty plea, because of the possible impact that compelled testimony may have on the defendant's as yet undetermined sentence." *U.S. v. Kuku*, 129 F.3d 1435, 1438 (11th Cir.1997).

[36]In *United States v. Kordel*, the Supreme Court found that a stay of the proceedings was not warranted, but then stated "we do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest unconstitutionality or even the impropriety of this criminal prosecution. 397 U.S. 1, 11-12, 90 S.Ct. 763, 769-770 (1970). In contrast to *Kordel*, the majority of these considerations are present in the case before this court. In fact, even the *Wall Street Journal* noted "investigators are using information provided by the 11 executives who have reached guilty pleas, including all five of the company's former chief financial officers. They are also studying documents seized in a March raid of HealthSouth's headquarters, **and information gleaned from a civil-court hearing over whether to freeze the assets of Richard M. Scrushy,** HealthSouth's ousted chairman and chief executive." *Wall Street Journal*, April 28, 2003, at A6 (emphasis added).

47 L.Ed.2d 810 (1976); *S.E.C. v. Dresser,* 628 F.2d 1368, 1375 (D.D.C. 1980); *Brock v. Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y.1985).   The exercise of the defendant's Fifth Amendment rights should not be made unnecessarily costly.  *United States v. Certain Real Property*, 55 F.3d 78, 84 (2nd Cir.1995); citing *Spevack v. Klein,* 385 U.S. 511, 515, 87 S.Ct.625, 17 L.Ed.2d 574 (1967).

## THE MERITS OF AN ASSET FREEZE

Although the SEC argued at the hearing in support of its argument that the standard it must meet to retain the asset freeze is lower than that for a preliminary injunction, *see* H.R. 1860, it cited no cases during the hearing in support of this theory. Of the cases it did cite, one is to inferences that can be drawn from witnesses taking the Fifth Amendment (H.R. 1879) and two involve the issue of tracing the assets sought to be frozen (H.R. 1880). Of the latter two, one case does not state on what authority it sought to keep the assets  frozen after issuing the TRO. In the other case, *SEC v. Current Financial Services*, 62 F.Supp.2d 66 (D.D.C. 1999), the asset freeze was issued as a preliminary injunction. In that case, the court noted that:

> District courts have the equitable power to use ancillary remedies to
> preserve assets, as conferred by Sections 20(b) and 22(a) of the Securities
> Act of 1933, 15 U.S.C. §§ 77t(b), 77v(a) and by Section 21(d) of
> the Securities Exchange Act of 1034, 15 U.S.C. §78u(e). *See SEC v.*
> *United Communications*, 899 F.Supp. 9, 11-12 (D.D.C. 1995). "It has
> been specifically recognized that a freeze of assets may be appropriate
> to assure compensation to those who are victims of a securities fraud."
> *SEC v. General Refractories Co.,* 400 F.Supp. 1248, 1260 (D.D.C. 1975).

*SEC v. Current Financial Services,* 62 F. Supp.2d at 67-68. That Court then stated, to ensure compensation to the victims in its case,"the Court finds it reasonable to maintain the freeze order because plaintiff has demonstrated that the potential disgorgement it could receive in this case far exceeds the amount that is frozen in the account." *Id.*, at 68 citing *SEC v. Grossman*, 887 F.Supp. 649, 661 (S.D.N.Y. 1995).

However, courts have also recognized that the primary purpose of disgorgement is to prevent the defendant's unjust enrichment, not to compensate investors. *SEC v. Grossman*, 2003 WL 133237 (S.D.N.Y.2003); *SEC v. Tome*, 833 F.2d 1086, 1096 (2nd Cir. 1987); *cert. denied,* 486 U.S. 1014 (1988). Once the primary purpose of disgorgement has been served by depriving the wrongdoer of illegal profits, the equitable result is to return the money to the victims of the violation. *SEC v. Drexel Burnham Lambert, Inc.*, 956 F.Supp. 503, 507 (S.D.N.Y.1997). However, such a distribution is not required by statute and, where distribution to victims of securities fraud is impractical, courts have permitted payment of disgorged funds to the Treasury. *See e.g., SEC v,. Dimensional Entm't Corp.*, 1996 U.S. Dist. LEXIS 2824 at *5-6; *SEC v. Lorin*, 869 F.Supp. 1117, 1129 (S.D.N.Y.1994).

In every case this court has found which addressed the basis for an asset freeze, each began with a TRO, as was entered by the court here. Thereafter, the court

entered a preliminary injunction to maintain the freeze. *See e.g., SEC v. Infinity Group Co.,* 212 F.3d 180, 186 (3rd Cir.2000); *SEC v. Interlink Data Network of Los Angeles, Inc.,* 77 F.3d 1201, 1203 (9th Cir.1996); *SEC v. Cherif,* 933 F.2d 403, 407 (7th Cir. 1991).

Although the SEC in the case before this court has stated it does not seek a preliminary injunction, the court has determined that no other basis for granting the relief requested by the SEC exists.[37] The plaintiff's counsel represented to the court that the standard it must prove for the asset freeze to remain in effect is "a reasonable likelihood, a likelihood, some probability of success. It is a lesser standard that even for a preliminary injunction" (H.R. 1860). The court finds that the SEC has provided no law to the court on what standard this might be if not within the realm of a preliminary injunction.[38]

---

[37]In its Memorandum of Law in support of its petition for emergency freezing the assets of defendant Scrushy, the SEC argues that "District Courts have routinely granted the SEC orders freezing assets in cases where, as here, there is a concern that the defendant might dissipate assets or transfer assets beyond the jurisdiction of the United States." Memorandum at 8. While courts may "routinely" so order, this court finds no evidence before it which even arguably raises a concern that defendant Scrushy might transfer his assets beyond the jurisdiction of the United States. His personal accountant testified she knew of no off-shore accounts or properties. H.R. 443. Brian Ray testified similarly. H.R. 668, 677. The defendant also surrendered his passport at the onset of this litigation.

[38]The court has considered that, perhaps, plaintiff's counsel meant to state that its burden for establishing its entitlement to a preliminary injunction is less than that when the injunction is sought between two private litigants. *See e.g. SEC v. Cavanagh,* 155 F.3d 129, 132 (2nd Cir.1998); citing *SEC v. Unifund SAL,* 9210 F.2d 1028, 1037 (2nd Cir.1990). However, that appropriate statement of law is simply too far from what plaintiff's counsel actually stated for the court to infer that this is what counsel meant to state.

Regardless of the elements plaintiff believes it must establish, the plaintiff must, at a minimum, establish that it has some likelihood of actually succeeding on the merits of the case, for obvious reasons. *See SEC v. Cavanagh*, 151 F.3d 129, 137 (2nd Cir.1998). The court is mindful that the SEC's determination that a violation occurred does not obviate the need for an independent judicial determination. *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 806-807 (2nd Cir.1975).

The Court in *Management Dynamics* opined:

> We scarcely mean to imply that judges are free to set to one side all notions of fairness because it is the SEC, rather than a private litigant, which has stepped into court. The securities laws ... hardly evidence a Congressional intent to foreclose equitable considerations by the district court .... '[I]n deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts.' But the statutory imprimatur given the SEC enforcement proceedings is sufficient to obviate the need for a finding of irreparable injury at least where the statutory prerequisite the likelihood of future violation of the securities laws has been clearly demonstrated.

*Management Dynamics*, 515 F.2d at 808 (citations omitted).

The Second Circuit in *Unifund SAL* reasoned that:

> even when applying the traditional standard of 'likelihood of success,' a district court, exercising its equitable discretion, should bear in mind the nature of the preliminary relief the Commission is seeking, and should require a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo. Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous of the burdens of the

36

> injunctions it seeks.  In some cases a preliminary injunction can have very serious consequences...

*Unifund SAL*, 910 F.2d 1028, 1039 (2nd Cir.1990) (citations omitted).

The sole issue before this court is whether or not the plaintiff is entitled to maintain a freeze on the defendant's assets based on the evidence presented to this court.  The court in *Management Dynamics* stated that "[u]nlike private actions, which are rooted wholly in the equity jurisdiction of the federal courts, SEC suits for injunctions are 'creatures of statute.' '[P]roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction' is not required."  *Id.*, at 808.

As the court discusses, *infra,* evidence of defendant Scrushy's involvement in the alleged scheme to inflate profits to meet Wall Street expectations is lacking.[39]  The SEC failed to set forth sufficient evidence to demonstrate that defendant Scrushy participated in the current alleged violations.  Perhaps in recognition of this fact by the SEC, the sole issue it has placed before the court is whether or not this court's prior Order freezing defendant Scrushy's assets should remain in effect pending the outcome of this litigation.

---

[39]Spectacularly lacking is any evidence of what Wall Street expectations were, or what the true earnings of HealthSouth should have been.  Without such evidence, the court cannot make a finding that earnings were inflated in any dollar amount and can thus make no determination as to any financial impact the alleged fraud had on the value of HealthSouth stock.

The court in *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2nd Cir.1990) stated, "Unlike the injunction against securities law violations, the freeze order does not place appellants at risk of contempt in all future securities transactions.  It simply assures that any funds that may become due can be collected.  The order functions like an attachment.  That does not mean, however, that its issuance must be tested against state law standards, as would be the case if the relief were sought pursuant to Rule 64 of the Federal Rules of Civil Procedure.  Congress has authorized the Commission to obtain preliminary injunctive relief upon a "proper showing," and it is a matter of federal law whether the showing the Commission has made is sufficient to support an interlocutory freeze order."

Applying the standard from *Unifund SAL*, the court considers what constitutes a "proper showing" as it is applied to the asset freeze.  In the facts before this court, there is no evidence of a reasonable likelihood that the alleged wrongs will be repeated.  Thus, even if this court assumes that the plaintiff is seeking an injunction against defendant Scrushy based on alleged violations of Section 10(b), 15 U.S.C. § 78j(b), the court has no evidence of a likelihood of the wrong being repeated.[40]

---

[40]15 U.S.C. § 78j states: It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange – (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance on contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

## THE INSIDER TRADING ALLEGATIONS

An insider trading violation requires proof not only that the defendant traded on the basis of material nonpublic information but also that in doing so he knew or should have known that he was breaching a fiduciary duty. *Unifund SAL,* 910 F.2d at 1039, citing *Dirks v. SEC*, 463 U.S. 646, 660, 103 S.Ct. 3255, 3264, 77 L.ed.2d 911 (1983); *Chiarella v. United States*, 445 U.S. 222, 230-32, 100 S.Ct. 1108, 1115-17, 63 L.Ed.2d 348 (1980).

In addition to fact that the SEC has relied almost solely upon evidence attained from the parallel criminal investigation as well as colloquies not offered for the truth of the matter asserted therein, the SEC has also failed to establish that the two trades at issue, the one made May 14, 2001 and the other made July 31, 2002[41] were made with the requisite scienter.[42] SEC maintains that defendant Scrushy, from at least 1999 through the second quarter 2002 in connection with the purchase and sale of securities

---

[41] For the purpose of this opinion, the retirement of defendant Scrushy's executive loan is treated like a "trade." H.R. 1878

[42] Section 10(b) and Rule 10b-5 prohibit any person from employing any device, scheme or artifice to defraud, making misrepresentations or misleading omissions, and engaging in any transaction, practice or course of business which operates as a fraud, in connection with the purchase or sale of securities. A person is liable under § 10(b) and Rule 10b-5 when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose and then (c) misappropriates or otherwise misuses that information (d) with scienter, (e) in breach of a fiduciary duty, other duty arising out of a relationship of trust and confidence, to make "secret profits." *Dirks v. SEC,* 463 U.S. 646, 654, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2nd Cir. 1999); *United States v. Newman,* 664 F.2d 12 (2nd Cir. 1981).

engaged in fraud in connection with these transactions.   The time line for defendant

Scrushy's trades is as follows:

In 1992 and 1993, Scrushy was granted the stock options pursuant to a 1991

Stock Option Plan. H.R. 1147-1148, 1150-1151.  These options were exercised by

him on May 14, 2002, the day the options expired pursuant to the Plan in 1991. *See*

Defendant Exhibit 33C.  Prior to May, 2002,  defendant Scrushy attempted to extend

the time for exercising said stock options.  H.R. 1149.  On May 14, 2002, on the last

day for the exercise of his stock options, defendant Scrushy exercised them in a same

day sale. Defendant Exhibit 8D.

Thereafter, on May 17, 2002, the Centers for Medicare and Medicaid Services

("CMS") issued Transmittal Letter 1753 regarding Medicare reimbursement

provisions for group versus individual physical therapy.  HealthSouth did not get a

copy of this Transmittal Letter.  An attorney working for HealthSouth had seen a copy

of it and asked other HealthSouth employees if they had seen it.  Upon informing the

attorney that they had not, HealthSouth, through Susan Smith, Director of

Reimbursement, followed up with Blue Cross Blue Shield. Defendant Exhibit 31.

Blue Cross Blue Shield was ambiguous as to the Transmittal Letter's application to

HealthSouth.  H.R. 1174, 1175.  William Horton, corporate counsel for HealthSouth,

testified that he could not determine the applicability of Transmittal 1753 just by

reading the Transmittal Letter.  H.R. 1173.  He stated 1753 was a directive to Medicare Part B carriers and its applicability to HealthSouth was unclear.  *Id.*

In early June, 2002, Susan Smith received a copy of Transmittal Letter 1753. Defendant  Exhibit 31.  Later that same month, Blue Cross Blue Shield notified HealthSouth that Transmittal Letter 1753 did not apply to HealthSouth.  Defendant Exhibit 31; *see also* Defendant Exhibit 8K.

On July 18, 2002, representatives of HealthSouth met with representatives for CMS in Washington D.C. for the purpose of determining whether Transmittal Letter 1753 applied to HealthSouth.  CMS was not sure if it applied either and wanted to study the applicability issue further.  H.R. 1156; Defendant Exhibits 31 and 8K.

On July 30, 2002, certain provisions of the Sarbanes-Oxley Act became effective. Although existing executive loans were "grandfathered" in by the provisions of the Act, new executive loans were made illegal effective July 30, 2002.  Sarbanes-Oxley Act § 402, 15 U.S.C. § 78m.

Therefore, on July 31, 2002, defendant Scrushy retired his loan pursuant to approval by the Compensation Committee for HealthSouth, after recommendation by

corporate counsel for HealthSouth, William Horton. H.R. 1151-1155, 1160, 1162-1164; Defendant Exhibits 8F, 8N, and 8O.[43]

On August 6, 2002, Owens told defendant Scrushy that the impact of Transmittal Letter 1753 would be only 15 to 20 million dollars. H.R. 802-03. In its Amended Complaint, the SEC asserts that 20 million dollars was indeed the impact Transmittal 1753 would have on HealthSouth's profits. Amended Complaint, ¶¶ 35-37. The evidence before the court establishes otherwise. Patrick Foster, President of the Inpatient Division, testified that his initial projection of the impact of Transmittal 1753 on solely his division was 22 million dollars. H.R. 856, 909. Larry Taylor, President of the Surgery Centers Division, testified that his projection of the impact of Transmittal 1753 on his division alone was approximately 30 million dollars.[44] H.R. 1004.

On August 8, 2002, the Board of Directors met and agreed that management should meet again with CMS in Washington as soon as possible to obtain further

---

[43]This repayment by defendant Scrushy was the repayment of the last executive loan under the 1999 Plan. It allowed HealthSouth to acquire over 2 million shares as part of the buyback effort without any additional cash outlay, and it reduced the depressive effect that would have resulted from defendant Scrushy selling his shares for cash in a down market to pay back the loan. Defendant Scrushy paid HealthSouth over 3 million dollars in interest on the loan and paid capital gains tax as a result of the retirement of the loan. Defendant Exhibit 8N.

[44]He further explained that much confusion concerned whether Transmittal 1753 applied to solely Part B Medicare providers, or Part A providers as well. H.R. 986, 989-991.

clarification and assess the impact on HealthSouth. Defendant Exhibit 8K. As of that date, the impact of Transmittal 1753 was still undetermined. H.R. 1171.

On August 14, 2002, forms 10-Q and 8-K were filed with the SEC. Said forms were signed by defendant Scrushy as CEO and CFO Weston Smith.[45]   Plaintiff Exhibits 7 and 8.

On August 15, 2002, management representatives from HealthSouth met with representatives from CMS in Washington D.C. again. H.R. 1171, 1176. At that meeting Tom Grissom, author of Transmittal Letter 1753, was present and CMS informed HealthSouth that the guideline did apply to HealthSouth. Defendant Exhibit 31; *see also* H.R. 1169-1178. Mr. Horton advised HealthSouth management that, since there was no definitive information regarding the impact of transmittal 1753 until August 15, 2002, the lack of 10-Q disclosure regarding this event was merely lack of disclosure of something management did not know and therefore could not disclose. Defendant Exhibit 31; H.R. 1180-1181.

During the following two weeks in August 2002, HealthSouth determined that the financial impact of Transmittal Letter 1753 would be 175 million dollars per year.

---

[45]Although William Owens had been promoted to CEO on August 8, 2002, his promotion as CEO of HealthSouth did not become effective until the Board of Directors' meeting August 26, 2002. Defendant Exhibit 8M. Thus, defendant Scrushy signed the certification on Form 10-Q filed August 14, 2002.

Defendant Exhibits 31 and 8M. *See also* H.R. 1176-1178. Owens and Susan Smith were involved in calculating this impact. H.R. 1177.

On August 27, 2002, HealthSouth issued a press release regarding this impact. H.R. 1177.

In September, 2002, HealthSouth retained FTI to confirm its analysis of the impact of Transmittal 1753. FTI's initial analysis, although not completed, fully supported HealthSouth's analysis of the impact being 175 million dollars per year. Defendant Exhibit 42. *See also* H.R. 1182.

On October 30, 2002, William Owens as CEO of HealthSouth issued a press release that defendant Scrushy was cleared, through an outside investigation by a national law firm, Fulbright & Jaworski L.L.P., of any allegations of inside knowledge concerning the impact of Transmittal 1753. Defendant Exhibit 8R. The Fulbright report concluded:

> Fulbright & Jaworski L.L.P. has uncovered no oral interview or written document (including electronic data) that establishes that Mr. Scrushy was aware at the time of his option exercise and sale of HEALTHSOUTH common stock on May 14, 2002 of the pending issuance of Transmittal 1753 [the Medicare rule change]. Fulbright & Jaworski L.L.P. also has uncovered no oral interview or written document (including electronic data) that establishes that Mr. Scrushy knew prior to the time of the transfer by Mr. Scrushy of HEALTHSOUTH common stock to HEALTHSOUTH on or about July 31, 2002, in satisfaction of the principal amount of loan made to him by HEALTHSOUTH under its 1999 Executive Loan Plan of: (i) Transmittal 1753 [the Medicare reimbursement rule change]; (ii) the application of

44

Transmittal 1753 [the reimbursement rule change] to the Company's various outpatient therapy services; or (iii) the Transmittal's potential effect on the Company.

*Id.*

## SCIENTER

### *Transmittal 1753*

To establish that it has some likelihood of success on the merits, the SEC must make a showing of the "requisite scienter to establish securities fraud." *SEC v. Infinity Group Co.,* 212 F.3d 180, 191 (3rd Cir. 2000) citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter is a mental state embracing intent to deceive, manipulate or defraud." *Infinity Group,* 212 F.3d at 192, quoting *Hochfelder,* 423 U.S. at 193 n.12. The Third Circuit stated:

> We have previously held that the scienter required for securities fraud includes recklessness, and we have adopted the definition of recklessness set forth in *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977). Accordingly, recklessness includes:
> [H]ighly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure   from the standards of ordinary care,... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*SEC v. Infinity Group Co.,* 212 F.3d at 192.

No evidence was presented by the SEC during its case in chief regarding Transmittal 1753 although the SEC specifically alleged that "Scrushy authorized a

45

scheme to blame a May 2002 Medicare billing guidance referred to as Transmittal 1753, for reduced future earning...." *See* Amended Complaint §§ 35-39 (doc. 21). As a matter of fact, when defense counsel first elicited evidence regarding this Transmittal at the presentation of Scrushy's case, counsel for the SEC objected. H.R. 880, 1045. However, defendant Scrushy, through corporate counsel Horton, presented uncontradicted evidence that Transmittal 1753 and its effect on HealthSouth was a real problem dealt with as expeditiously as possible and not merely a convenient, imaginary means to offset fictitious profits. Moreover, the court finds that the publication of Transmittal 1753 in May of 2002, three days after defendant Scrushy's options pursuant to the 1991 Stock Option plan expired, could not have been known to defendant Scrushy in 1992 or 1993 when the Options were granted, some ten years prior to the sale at issue here. Obviously, defendant Scrushy could not have been aware of the existence of Transmittal 1753 in 1992 and 1993, since it did not exist then, nor should he have been expected to intuit that it would be promulgated by CMS some ten years later.

The court finds that, in addition to lack of knowledge of the alleged insider information, it is a defense to an allegation of violation of Section 10b and Rule 10b5-1, if the person making the purchase or sale demonstrates that the purchase or sale that occurred was made pursuant to a plan. *See* 17 CFR § 240.10b5-1(c)(C). It is

uncontradicted that defendant Scrushy exercised his option on May 14, 2002, pursuant to the Stock Option Plan of 1991. Defendant's Exhibit 33C.

*The Executive Loan*

With respect to the retirement of Scrushy's executive loan, the court notes that at the time such loan was made in 1999 it was entirely legal. The Sarbanes-Oxley Act was enacted three years later in response to the Enron Scandal. *See* H.R. Rep. No.108-63(I). The retirement of this loan seems entirely reasonable in response to the promulgation of the Act and the public debate that preceeded it. As discussed above, corporate counsel recommended that the loan be retired, as it allowed HealthSouth to acquire over two million shares of its own stock without any cash outlay, reduced the depressive effect which would have resulted from Scrushy selling his shares for cash on the open market and removed the stigma resulting from an executive loan, albeit one grandfathered in by the Act. Additionally, the undisputed evidence is that no one, not even CMS, who drafted the Transmittal, nor Blue Cross Blue Shield, knew the effect of Transmittal 1753 until August 15, 2002.

Even after retiring the executive loan in July of 2002, the number of shares owned by Scrushy remaining after the 1999 transaction was 1.85 million. H.R. 1208. Mr. Horton further testified that the value of those shares has fluctuated between 10 and 15 cents per share. H.R. 1209. Mr. Horton testified that Scrushy spent in excess

of eight million dollars to relinquish the loan and ended up holding shares worth $180,000. He conceded that was not a very profitable transaction. H.R. 1209. *See also* defendant Exhibit 8P.[46]

## ALLEGATIONS OF INTERNAL CONTROLS VIOLATIONS

The SEC further alleges in its complaint that defendant Scrushy was in violation of Sections 13(b)(5) and 13b2-1. Section 13(b)(5) of the Securities Exchange Act of 1934 prohibits anyone from circumventing or failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account under Section 13(b)(2)(A). The Securities and Exchange Act requires a corporation to "maintain a system of 'internal accounting controls' in order to allow preparation of financial statements 'in conformity with generally accepted accounting principles or any other criteria applicable to such statements.'" *Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994); 15 U.S.C. §78m(b)(2). However, the evidence in the record before this court indicates that far from failing to implement a system of internal accounting

---

[46] Larry Taylor, President of the Surgery Division of HealthSouth, testified that revenue for the Surgery Division for the year 2002 was 1 billion dollars. H.R. 940. He also testified that the EBITDA last year for the Surgery Division was $300 million. H.R. 940. Patrick Foster, President of the Inpatient Division of HealthSouth, testified that 23,000 HealthSouth employees work in his division. H. R. 863. Approximately 50% of the entire revenue for HealthSouth are generated in his division. H.R. 865. His division is on budget for the current fiscal year. H.R. 871-872. During the year 2002, HealthSouth's Inpatient Division generated 1.8 to 1.9 billion dollars in revenue. H.R. 865. The EBITDA for that division for 2002 was 600 to 650 million dollars. H.R. 869. Weston Smith testified, using the figures for revenue and EBITDA testified to by Taylor and Foster, HealthSouth is worth 4.4 billion dollars, H.R. 1089, while it is trading at a market cap of 40 to 50 million dollars. H.R.1089. When asked whether he could explain why, in this current market a 4.4 billion dollar company is trading at a market cap of 40 to 50 million dollars, Smith pled the Fifth, and when asked whether or not it was a direct result of the SEC's lawsuit, he again pled the Fifth. H.R. 1090.

controls, defendant Scrushy was the key figure in the implementation and promotion of internal accounting controls and anti-fraud provisions within HealthSouth. H.R. 190. During Scrushy's tenure at HealthSouth as CEO and following the corporate fraud scandals that erupted, HealthSouth stressed corporate integrity and distributed anti-fraud cards to its employees complete with a 1-800 fraud hotline for employees to call. H.R. 139, 796; Defendant Exhibit 10.

Meetings of the senior staff at HealthSouth were frequently held on Mondays and presided over by defendant Scrushy while he was CEO. During these meetings, corporate compliance was a frequent topic of discussion and defendant Scrushy referred to the importance of the internal compliance cards which contained a 1-800 fraud hotline. H.R. at 795-796, 798. Furthermore, HealthSouth's system had set up multiple channels which employees could utilize to report issues involving corporate integrity. H.R. 144. An employee could either utilize the 1-800 number to report issues with corporate integrity, write a letter to the corporate compliance department or an employee could go directly to the corporate compliance department at HealthSouth. H.R. 144. Additionally, other HealthSouth employees testified to the internal controls within their specific divisions and the check and balances used to ensure that those controls worked. *See e.g.*, H.R. 865-871, 930-937, 1244-1248, 1282, 1293, 1302-1303, 1342-1343, 1398-1399.

49

The sole evidence that the SEC has put forth regarding a lack of internal controls at HealthSouth is the fact that eleven individuals at the corporation have pled guilty to accounting fraud. However, this in and of itself is insufficient to demonstrate a lack of internal controls at HealthSouth. An internal control system that can catch every type of fraud occurring at a corporation is as prevalent as the mythical pink elephant.

Additionally, Teresa Sanders, an internal auditor, testified that she attempted to meet with defendant Scrushy about the fact that she was being denied access to the corporate accounting books, but she was never successful at gaining an appointment with him on that subject. H.R. 169. However, this is not evidence that defendant Scrushy knew that Sanders did not have access to the corporate books, especially in light of the fact that Sanders had numerous other opportunities to discuss with Scrushy the topic at both large and one on one meetings and choose not to do so. H.R. 171, 201. Accordingly, the SEC has simply failed to meet its burden in regard to demonstrating that defendant Scrushy failed to implement sufficient internal controls at HealthSouth.

Moreover, even if the internal controls at HealthSouth were insufficient, Section 13(b)(5) requires a knowing failure of an individual to implement an internal accounting control system and no showing has been made that defendant had any such

knowledge. As previously stated, the only evidence before this court is that defendant Scrushy promulgated an internal control system at HealthSouth and spread the word about that system through meetings. The same knowledge requirement applies to a violation of 13(b)(5) for circumventing a corporation's internal accounting controls. This court has already discussed the failure of the SEC to meet its burden in regard to Scrushy's knowledge of the ongoing fraud.

## THE REBUTTAL CASE

In rebuttal of defendant's case, the SEC did no more than confirm that it had a pending investigation of the company's use of Transmittal 1753, when the SEC requested the company to file Form 10-Q for the quarter ending September 30, 2002, as it had no further comments on their financial statement, and just needed it filed in final form. H.R.1670.[47]

## THE NEED FOR A STAY

As previously discussed, the SEC's other evidence of an alleged fraud on the part of defendant Scrushy was obtained from both FBI and from the parallel criminal

---

[47]It might be considered questionable practice for the SEC on the one hand to tell HealthSouth that it has no further comments regarding its financial statement, while it has an ongoing investigation into securities fraud at the same time. A filing pursuant to the SEC's request would inevitable lead to an additional charge for filing a fraudulent Form 10-Q.

The court finds the testimony of another rebuttal witness, Neal Webster, who was an internal auditor in 1989 for HealthSouth, and a convicted felon, not credible.

Furthermore, when counsel for SEC called Hope Chi-Mills as a rebuttal witness, and it was discovered that she had attended the proceedings in the courtroom the previous day although the Rule had been invoked by the parties, Mr. Hicks stated: "I didn't know what she looked like," leading the court to once more wonder which governmental agency in fact did the investigation for the SEC. H.R. 1822.

investigation.  Although the SEC, since the conclusion of the hearing on whether or not the asset freeze should remain in full force and effect, has filed a "motion to supplement the record with the guilty pleas of Michael Martin and Malcom McVay" (doc. 114), such motion further supports defendant's argument that the SEC's investigation into this civil matter is in fact a precursor for a setup to the criminal indictment and this court's conclusion that the SEC has no evidence other than what stems from the parallel criminal investigation.  Allowing those pleas as evidence of defendant Scrushy's involvement in the alleged securities fraud, without allowing defense counsel to cross-examine these witnesses, is just another reason to support the court's conclusion that this matter should be stayed pending completion of the criminal investigation or until  such witnesses have been sentenced and can no longer invoke their privilege pursuant to Fifth Amendment of the United States Constitution.

The SEC has sought an asset freeze of unlimited duration based on the evidence discussed above.  Courts generally frown upon asset freezes of unlimited duration. *See e.g.*, *Unifund Sal* , 910 F.2d at 1042-1043.  As one court has noted "[a] stay in this type of case is often relatively indefinite, because there is no way to predict when the criminal investigation would end." *Walsh Securities, Inc. v. Cristo Property Management, Ltd.*, 7 F.Supp.2d 523, 528 (D.N.J. 1998).  That Court was faced with the same considerations facing this court, not the least of which is that discovery in

the case before the court has been, and will continue to be, all but meaningless, as many witnesses have, and will continue to, assert their Fifth Amendment privileges. The Court thus held that, although "it is not unconstitutional to force defendant[] into this choice, the Court finds that the strong potential for an unjust result outweighs the efficiencies gained by allowing the case to proceed." *Id.*, at 529. *See also Federal Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir.1989); *SEC v. Dresser Indus., Inc.,* 628 F.2d 1368, 1375 (D.C.Cir.1980). This Court also notes that, like the situation before the New Jersey district court, a stay here would benefit the public by allowing the Government to conduct a complete, unimpeded investigation into potential criminal activity. *Walsh Securities*, 7 F.Supp.2d at 529. Assumably for these reasons, the court in *SEC v. Tandem Management* closed its case altogether, subject to reopening upon petition of one of the parties, when the U.S. Attorney's Office began a grand jury investigation into the activities alleged in the SEC's civil complaint. *SEC v. Tandem Management*, 2001 WL 1488218 (S.D.N.Y.2001).

No question exists that this court has the power to stay a civil proceeding due to an active, parallel criminal investigation. *See e.g. Sterling National Bank v. A-1Hotels, Int'l, Inc.*, 175 F.Supp.2d 573 (S.D.N.Y.2001); *Walsh Securities*, 7 F.Supp.2d at 527; *Tandem Management*, 2001 WL 1488218 at *4 ("Where ... the SEC brings a civil enforcement action that proceeds in a parallel with a related criminal proceeding,

it is often appropriate to stay the civil action pending resolution of the criminal proceedings"). "[T]he power to stay proceedings is incidental to the power inherent of every court to control the disposition of the causes on its docket with the economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Texaco Inc. v. Borda*, 383 F.2d 607, 608 (3rd Cir.1967).

In determining whether to stay a civil case, the court may consider a variety of factors, including the extent to which the defendant's Fifth Amendment rights are implicated, the interest of the plaintiff in proceeding expeditiously with this litigation and the potential prejudice to the plaintiffs from delay, the burden any particular aspect of the proceedings may impose on the defendant, the efficient use of judicial resources, the interests of persons not parties to the civil litigation and the interest of the public in the pending civil and criminal litigation. *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324-325 (9th Cir. 1995). Other courts have added factors such as the extent to which the issues in the criminal and civil cases overlap, the status of the case, including whether the defendant has been indicted. *See e.g., Walsh Securities*, 7 F.Supp.2d at 526-527.

A balancing of these factors must be done on a case by case basis with the goal being to avoid prejudice. *Volmar Distributors, Inc. v. New York Post Co.,* 152 F.R.D.

36, 39 (S.D.N.Y. 1993). The degree to which the issues in the simultaneous civil and criminal proceedings overlap is the most important threshold issue in deciding whether the court should stay the civil proceeding. *See Walsh Securities*, 7 F.Supp.2d at 527.

Because this is a case where the government has undoubtedly manipulated simultaneous criminal and civil proceedings, both of which it controls, "there is a special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominally civil means. In that special situation the risk to individuals' constitutional rights is arguably magnified." *Sterling National Bank*, 175 F.Supp.2d at 579.

The court finds the criminal and civil cases overlap completely. The issues in both are identical. *See* Motions to Intervene (docs. 60, 62, 81, 85 and 94), at 2 ("the subject of this civil action is directly related to the subject matter of an ongoing grand jury investigation of ... Defendant Richard Scrushy") and 8 ('the ongoing criminal investigation ... of Defendant Richard Scrushy and present and former employees of HealthSouth Corporation involve the same facts that form the basis of the civil suit"). Although defendant Scrushy has not yet been indicted, no one has represented to the court that such indictment is anything but an eventuality. During this court's hearing, the U.S. Attorney's Office intervened repeatedly in an attempt to prevent defendant

Scrushy from obtaining any evidence in this civil proceeding that he would not be entitled to in a criminal proceeding. Although the plaintiff does have an interest in the expeditious resolution of this case, the court finds the harm to defendant Scrushy from blindly pushing ahead with this matter to greatly outweigh the prejudice to the SEC from a stay of this civil proceeding. Given that the evidence presented by the SEC was that obtained from the FBI pursuant to the criminal investigation, and the guilty pleas already entered, the court actually finds the SEC may actually benefit from a stay to allow the FBI to continue gathering evidence.

The court finds, in the same vein, that both the SEC and defendant Scrushy would benefit from a stay of this case until all those who pled guilty have been sentenced, so that testimony may be obtained from them at the final hearing in this case, rather than repeated insistence by these individuals on their Fifth Amendment rights. This is especially true given the U.S. Attorney's Office's great efforts to prevent the testimony of "Owens, Livesay, Smith, Harris, or Morgan, or any other witness with knowledge about matters being criminally investigated ..." Motions to Intervene (docs. 60, 62, 81, 85 and 94), at 2. Additionally, the plaintiff here is not an individual who has been wronged, but the SEC, which is a governmental body.

While a stay in a civil proceeding when no indictment has yet issued in the criminal proceeding is rare, issuing such a stay is within this court's inherent powers.

*See SEC v. Incendy*, 936 F.Supp. 952, 955 (S.D.Fla.1996); citing *Landis v. North American Co.*, 299 U.S. 248, 254-55, 57 S.Ct. 163, 165-66, 81 L.Ed. 153 (1936). *See also SEC v. Zimmerman*, 854 F.Supp.896, 899 (N.D.Ga.1993), citing *SEC v. First Financial Group of Texas*, 659 F.2d 660, 668 (5th Cir.1981). The Fifth Circuit Court of Appeals stated "[j]udicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other. In some situations it may be preferable to stay the civil proceeding." *United States v. Gieger Transfer Serv. Inc.*, 174 F.R.D. 382, 385 (S.D.Miss. 1997); quoting *Campbell v. Eastland*, 307 F.2d 478,487 (5th Cir. 1962). A stay of the civil proceeding "contemplates 'special circumstances' and the need to avoid 'substantial and irreparable prejudice.'" *United States v. Little Al*, 712 F.2d 133, 136 (5th Cir. 1983).

The court's role in a civil proceeding such as that before it is to ensure that fairness permeates the proceeding and to try to ascertain the truth.[48] The court is unable to accomplish either of these purposes here, as the witnesses who could testify as to the allegations in the SEC's complaint have refused to do so, by invoking their

---

[48]The Ninth Circuit Court of Appeals has wisely noted that "[i]n highly publicized cases, such as the one at hand, judicial ... decisionmakers need to be especially careful that undue consideration is not given a proceeding's impact on the public. Governmental entities are frequently aware of the need to reassure the public that they are taking prompt action in response to a crisis. In such high visibility situations, it is especially necessary to guard the rights of defendants, and concern for the public deterrence value of an enforcement proceeding must not be allowed to override the individual defendant's due process rights." *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir.1994).

Fifth Amendment rights.[49]  Although the court may draw inferences from such use of

the Fifth Amendment in a civil proceeding, the inferences here are too speculative to

draw.[50]  *See e.g., United States v. A Single Family Residence & Real Property Located*

*at 900 Rio Vista Blvd., Fort Lauderdale*, 803 F.2d 625, 629 n. 4 (11th Cir.1986).

These problems are further compounded by the U.S. Attorney's Office and

Department of Justice's efforts to prevent defendant Scrushy from obtaining any

discovery.  These entities argued that "to permit any depositions to be conducted by

the defendants in this civil action would result in disclosure of sensitive information

critical to the criminal investigation and to an anticipated trial.  For these reasons, the

Government requests that it be permitted to intervene and that this Court either quash

any and all subpoenas issued by Defendant Scrushy to the above-named specific

---

[49]Of course, the Fifth Amendment privilege against self incrimination can be asserted in any proceeding, whether civil or criminal.  *Kastigar v. United States*, 406 U.S. 441, 444-445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972).  The privilege is violated when a defendant, who is a defendant in both a criminal and civil case, is forced to choose between waiver of testimonial privilege and automatic entry of an adverse judgment in a civil case.  *Pervis v. State Farm Fire & Casualty Co.*, 901 F.2d 944, 946-949 (11th Cir. 1990).

[50]Each of the witnesses in this case who have entered guilty pleas have entered plea bargains with the government.  Each has agreed to provide "substantial assistance" to the U.S. Attorney's office in its ongoing investigation in exchange for a downward departure upon sentencing.  Each has taken the Fifth in response to questions about his or her, or defendant Scrushy's role in the allegations.  The court has considered what motivations a witness, who has already entered a plea, but not yet been sentenced, may have to invoke the Fifth Amendment in response to information stated by him or her in open court upon entering a plea of guilty.  The court has considered perhaps the prosecutor's desire to not reveal its hand during this civil proceeding, evidence of additional, uncharged crimes, and even possible future perjury charges as motivating factors.  Given these uncertainties, the court is unable to draw any inferences adverse to defendant Scrushy from such testimony.  The court notes issues such as this should resolve themselves upon these witnesses giving their testimony during the criminal proceeding and being sentenced.  At least then, defendant Scrushy will have some factual basis to determine how best to defend himself, or whether to defend himself at all.

individuals and  to any and all witnesses who may be called who have knowledge about the criminal investigation in this case, and prohibit their compelled testimony, or in the alternative, that these civil proceedings be stayed in their entirety." Motions to Intervene (docs. 81, 85 and 94), at 2.

To date, the SEC has failed to establish, as opposed to allege, that defendant Scrushy was involved in the fraud.  The SEC moved to have the plea colloquies admitted into evidence for the sole purpose of the court taking judicial notice of the fact that those entering guilty pleas, had in fact entered guilty pleas.  The court cannot, on its own, now consider those pleas for the truth of the matters asserted therein.  In plaintiff's closing arguments, the SEC asserted that this court should take the statements made in the plea colloquies of Owens, Smith and Harris as evidence of Scrushy's involvement in the accounting fraud present at HealthSouth.  However, the court cannot draw that reference from that evidence as it was admitted.  First, counsel for SEC specifically asked this court to take judicial notice of the guilty pleas in question **solely for the purpose of noting that the individuals pled guilty to the crimes for which they were charged and not for the contents of their statements.** This is the purpose for which this court admitted those statements.  Second, the statements in the plea colloquies implicating "the then CEO" are inadmissable hearsay and thus cannot be considered by this court for the truth of the matter asserted.

59

"Hearsay testimony is presumptively unreliable under the common law because the opposing party has no opportunity to cross-examine and test the declarant's truthfulness under oath before the factfinder." *U.S. v. Shukri*, 207 F.3d 412, 417 (7th Cir. 2000).   Hearsay testimony is admissible as evidence, however, when the declarant's statement bears sufficient indicia of reliability to alleviate the concerns arising out of the opposing party's inability to cross-examine the declarant. *Id.*

In the present case, the requisite guarantees of truthfulness are lacking and the statements fail to fall within any exception to the hearsay rule.  The statements against the "then CEO" were made pursuant to a plea agreement that served to substantially reduce the pleader's criminal liability and thus provides no great indicia of reliability. The statements are not admissible as statements against interest because "only those specific statements within a general confession which are self-inculpatory are admissible under Rule 804(b)(3)..." *McClung v. Wal-Mart Stores, Inc.*, 270 F.3d 1007, 1013 (6th Cir. 2001).  As noted by the Supreme Court:

> In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.  The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession and this is especially true when the statement implicates someone else.

60

*Williamson v. United States*, 512 U.S. 594, 600-01, 114 S.Ct. 2431, 129 L.Ed.2d 476

(1994). The statements made against "the then CEO" do not expose the pleaders to

any additional liability and in fact, these statements were made as part of a plea

agreement specifically designed to reduce the individual's criminal liability.

Accordingly, while the statements made by Owens, Smith and Harris which implicate

themselves are admissible, the statements implicating the "then CEO" are

inadmissable hearsay. *See* Rules 803 and 804, Federal Rules of Evidence.

The attorney for the SEC continued in his closing by stating:

> Looking at the colloquies alone, we now have four high level
> people tying the fraud to Mr. Scrushy, and another four or five verifying
> that the fraud existed.
> In addition to that, we have the CD which cannot be interpreted
> any other way than to lead to a conclusion that Scrushy knew about the
> fraudulent financial statements.

H.R. 1864. This court disagrees. This court must consider solely the evidence

presented to it, and properly admitted. While others are free to engage in rank

speculation, this court is not. When the CD is considered in its entirety, this court

finds the conversation to which the SEC refers to be ambivalent at best.

Questions concerning the context of the conversation on the CD become even

more complex given that defendant Scrushy was cooperating with the SEC in an

investigation into allegations of insider trading for many months prior to March 18,

2003. *See* Defendant's motion for a protective order (doc. 7), ¶ 4. Because of that

investigation, defendant Scrushy voluntarily submitted to a deposition by the SEC

regarding insider trading issues. *Id.*, ¶ 5. That deposition was submitted as evidence

in this case (doc. 9). In response, the SEC agrees that the deposition, submitted by the

SEC in this case, primarily focused on possible insider trading.[51]   Plaintiff's

opposition (doc. 8) at 4. Coincidently, the day after that deposition, the SEC learned

of allegations of accounting fraud and thus "Scrushy's investigative testimony does

not relate to the issues currently before the Court." *Id.* at 5. The SEC then argues that

defendant Scrushy is not entitled to a protective order "because his testimony is

relevant and necessary for the SEC to establish a need for an asset freeze ... He is the

person most likely to be able to identify those assets that would be covered by any

freeze. He also has direct knowledge that will help define the potential amount of the

Commission's disgorgement claim ...." *Id.* at 5-6. *See also* Plaintiff's Certification

---

[51]This position by SEC counsel was further corroborated by Jamie Ponton, who is a staff accountant with the Securities and Exchange Commission, division of corporation finance. H.R. 1667. She was assigned to review some of HealthSouth's filings. H.R. 1668. She testified that, after drafts of the filings, specifically the September 30, 2002 10-Q were reviewed by the SEC, and after there were no further comments concerning her review, she called Bill Horton to "communicate that we at Corp.Fin. had no further comments on their financial statements, but that we would anticipate them filing the amended September 30th 10-Q filing as amended in the draft, we would anticipate them filing that with the commission in final.

And I would expect them to do that within ten business days was my message to Mr. Horton." H.R. 1669-1670.

This conversation took place on March 4, 2003. H.R. 1670. At the time she left this message for Horton, she knew there was an enforcement investigation pending which involved program Transmittal 1753 and its impact on the earning statements. H.R. 1673, 1675. However, she did not notify Neil Seiden, who was in charge of that investigation, that she told Horton to submit the 10-Q in final form . H.R. 1675. Ms. Ponton agreed that such the 10-Q filing would be based on her representation that it was "okay." H.R. 1680-1681. However, she also agreed that such a filing would have allowed another arm of the SEC to turn around and charge HealthSouth with a violation of the Securities and Exchange Act because they were doing an investigation on an issue that directly impacted on the earnings of HealthSouth. H.R. 1681-1682.

pursuant to Rule 65(b) (doc. 3), ¶ 6. The court therefore has before it the SEC's own admission that it needs defendant Scrushy's testimony to prevail on the asset freeze. However, because of the ongoing criminal investigation, defendant Scrushy was fully within his rights to exercise the Fifth Amendment prohibition against self-incrimination.

The Court in *Unifund SAL* aptly stated, "bearing in mind the basic principle that burdensome forms of interim relief require correspondingly substantial justification, we conclude that the Commission's showing in this case is inadequate to support the extensive trading restriction in the freeze order. The Commission has presented a thin case for any ancillary relief ...." 901 F.2d at 1042. The SEC asks this court to bridge this gap in the evidence through speculation. The court is asked to assume that the trades were made for an insidious purpose based on no more than the SEC's allegations.

## CONCLUSION

This Court cannot engage in rank speculation based on allegations in pleadings. Likewise, this court will not enter Orders which are not supported by the evidence before it. The court having considered all of the foregoing, finds as follows:

The defendant having made an oral motion to dismiss the petition for emergency relief during the course of these proceedings, and the court having taken

such motion under advisement, the court is of the opinion said motion to dismiss is due to be **GRANTED** and shall rule by separate order.  The court finds that the evidence produced by the SEC to date does not rise to a level of establishing even a reasonable likelihood of success on the merits of this case.  The asset freeze heretofore imposed upon defendant Scrushy is dissolved.  The plaintiff is given leave to re-petition the court for an asset freeze should it adduce sufficient evidence to justify such a freeze in the future.  This case is stayed pending the resolution of any criminal charges against defendant Scrushy, or notification by either party that such charges will not be forthcoming.

 **DONE** this the ___7___ day of <u>May,</u> 2003.

<u>_Inge P. Johnson_</u>
UNITED STATES DISTRICT JUDGE
INGE P. JOHNSON